IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| SPINAL CONCEPTS, INC. § | |
| § | |
| Applicant, § | CIVIL ACTION NO. |
| § | 3:06-CV-0448-P |
| v. § | |
| § | |
| CURASAN, AG, § | |
| § | |
| Respondent. § | |

## **MEMORANDUM OPINION AND ORDER**

Now before the Court are (1) Spinal Concepts, Inc.'s Motion to Vacate Arbitration Award, filed March 13, 2006; (2) curasan AG's Motion for Application for Order Confirming Arbitration Award, filed, May 2, 2006; (3) Spinal Concepts' Unopposed Motion for Leave to File Surreply, filed July 28, 2006; and (4) curasan, AG's Unopposed Motion for Leave to File Sur-surreply, filed August 4, 2006. After considering all relevant materials, the Court hereby GRANTS Spinal Concepts' Unopposed Motion for Leave to File Surreply; GRANTS curasan, AG's Unopposed Motion for Leave to File Sur-surreply; GRANTS in PART and DENIES in PART Spinal Concepts' Motion to Vacate Arbitration Award; and GRANTS in PART and DENIES in PART curasan AG's Motion for Application for Order Confirming Arbitration Award.

## **BACKGROUND**

curasan, AG ("curasan" or "Supplier") makes and sells a bone-graft substitute called Cerasorb. Cerasorb is used by surgeons to help human bones regenerate after certain types of surgical operations.

In 2002, curasan entered into a five-year distribution contract with Spinal Concepts, Inc. ("Spinal Concepts" or "Distributor") that gave Spinal Concepts the exclusive right to market, sell,

1

and distribute Cerasorb for use in spine surgeries in the United States and Costa Rica. This International Distribution and Marketing Agreement ("Agreement") became effective on October 23, 2002.

Spinal Concepts failed to purchase the minimum amount of product required by the Agreement for 2004 and did not purchase any product thereafter. curasan believed that Spinal Concepts' failure to purchase the minimum amount of Cerasorb as required by the Agreement constituted a breach of the Agreement. Consequently, curasan terminated the Agreement and initiated arbitration proceedings against Spinal Concepts, alleging, *inter alia*, that Spinal Concepts failed to satisfy its minimum purchase requirements under the Agreement for the years 2004, 2005, 2006, and 2007.

On March 9, 2006, the arbitrator entered an award ("Award") in favor of curasan in the amount of nearly $2 million. The Agreement provided that the arbitrator's Award may be appealed to this Court for any errors of law, but not for errors of fact. It is Spinal Concepts' appeal of the Award that is now before the Court.

## **DISCUSSION**

Spinal Concepts argues that the arbitrator erred in several respects with regard to the interpretation of the Agreement and the law governing it. Specifically, Spinal Concepts contends that the arbitrator committed legal error by (1) awarding damages despite the Agreement's exclusive remedy provision; (2) awarding damages for breach of provisions of the Agreement that are unenforceable as a matter of law because they violate the Statute of Frauds; (3) awarding damages for lost profits that are barred as a matter of law; and (4) awarding damages that are purely speculative and barred under Texas law.

Ordinarily, the district court's review of an arbitration award is extremely narrow, with the

court being limited to determining whether or not the arbitrator acted with "'manifest disregard for the law.'" *Harris v. Parker College of Chiropractic*, 286 F.3d 790, 792 (5th Cir. 2002) (citation omitted). However, arbitration is a "creature of contract" and parties are free to structure their agreement as they see fit. *See Gateway Techs., Inc. v. MCI Telecomms. Corp.*, 64 F.3d 993, 996 (5th Cir. 1995). Therefore, both parties to a contract may agree to expand the court's review of an arbitration award beyond the default standard of review. *See id.* at 997. In this case, the Parties contractually agreed to expand judicial review by including a contractual provision that allows for *de novo* review of issues of law embodied in the arbitration Award.

I.      **ENFORCEABILITY OF CONTRACT WITH MISSING QUANTITY TERM.**

The distribution Agreement between the Parties required Spinal Concepts to purchase a minimum amount of product, called a Quota, for the first two years of the Agreement. Section V.3 of the Agreement is entitled "Purchase Minimums" and states as follows: "[Spinal Concepts] shall achieve the mutually agreed upon yearly minimum purchase quantities ("Quotas") established in Exhibit B in the Exclusive Territory during the first two year period of the Agreement . . ." (Agreement § V.3.) Exhibit B set out Spinal Concepts' purchase minimums as follows: $500,000 for 2003 and $625,000 for 2004. (Agreement Ex. B.) The Agreement did not specify any Quota amounts for the subsequent three years; rather, the Parties agreed they would negotiate and mutually agree on those Quota amounts in good faith. (Agreement § V.3.) ("[S]ubsequent yearly minimum Quotas following this first two-year period shall be negotiated in good faith and mutually agreed upon in writing.")[1]

---

[1] The Court disagrees with curasan's position that the Quota amounts for 2003 and 2004 constituted factual determinations made by the arbitrator. (Reply to Mot. for Order Confirming Arb. Award at 5.) The Quota amounts were unambiguously set forth in the Agreement and the arbitrator recognized as a matter of law - and this Court agrees - that the purchase minimum for 2003 was $500,000 and for 2004 was $625,000.

3

The Agreement also required Spinal Concepts to deliver a quarterly sales forecast to curasan at least ninety days before each calendar quarter. In the forecast, Spinal Concepts was expected to estimate the amount of product Spinal Concepts would need over the next four quarters. (Agreement § V.1.(i).)[2] The Parties agreed that Spinal Concepts would purchase an amount of product each quarter equal to at least 80% of the first forecasted quarter, but that curasan would not be obligated to supply an amount equaling more than 20% above the first forecasted quarter. (Agreement §§ V.1.(ii), V.3.)[3]

From the face of these provisions, it appears that the Parties intended to impose definite minimum floor Quota amounts on Spinal Concepts for 2003 and 2004, and required the Parties to negotiate in good faith to determine the definite minimum floor Quotas for 2005-2007. The Agreement also required Spinal Concepts to deliver a quarterly sales forecast to curasan at least ninety days before each calendar quarter. In the forecast, Spinal Concepts was expected to estimate the amount of product Spinal Concepts would need over the next four quarters. It appears that these provisions were intended to work as a forecasting tool to assist curasan in meeting Spinal Concepts' demand while avoiding inefficient overproduction. Spinal Concepts was required to purchase each quarter an amount between 80% and 120% of the first forecasted quarter amount.

---

[2] The Agreement states that Spinal Concepts, "at least 90 days prior to the beginning of each calendar quarter, shall deliver to curasan a sales forecast and estimated quantity of purchase of the Products for the next four (4) consecutive quarters."

[3] The Agreement states that "Distributor agrees to purchase quantities of Product each quarter equal to no less than eighty percent (80%) of the first forecasted quarter in Section V.1.(i)" and "[i]n no event shall Supplier be obligated to supply the Products to Distributor in any calendar quarter in excess of 20% (twenty percent) of the quantity for the first forecasted quarter."

4

Spinal Concepts met its Quota for 2003. It fell short of its Quota for 2004 by $455,200.[4] The arbitrator found that Spinal Concepts was liable to curasan for the lost profits curasan incurred due to Spinal Concepts' failure to purchase the agreed amount of product for 2004.

With respect to the remaining three years of the Agreement - 2005, 2006, and 2007 - Spinal Concepts did not order any product in any of those years. curasan argues that Spinal Concepts is liable to curasan for failing to purchase the minimum purchase quantities for those years as well.[5]

There is no dispute that the Agreement did not provide a definitive Quota for 2005-2007. Spinal Concepts contends that the Parties' failure to specify Quota amounts for 2005-2007 renders the Agreement unenforceable under the Statute of Frauds and as an agreement to agree.

The arbitrator rejected Spinal Concepts' argument and found that the absence of the quantity term was not fatal to the Agreement. The arbitrator held that the Texas Business & Commerce Code allows the Court to enforce a contract that is missing a key term "if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." *See* Tex. Bus. & Comm. Code § 2.204 (Vernon 1994). The arbitrator concluded that it was clear that the Parties intended to make a contract and found that notwithstanding the absence of a minimum purchase amount for 2005-2007, Section V.3 provided a reasonably certain basis for giving an appropriate remedy. (App. at 37.) The arbitrator interpreted the "base minimum requirement" of Section V.3 as "clearly" providing an objective criterion for the base minimum purchase

---

[4] The Court agrees with curasan that these determinations are factual determinations made by the arbitrator, by which the Court is bound. These amounts were not calculated based on the terms of the Agreement, but rather were based on evidence extrinsic to the Agreement.

[5] curasan argues that the arbitrator's determination that "the parties failed to agree in writing upon specific purchase minimums for years 2005 through 2007" was a factual determination by which the Court is bound. (Reply to Mot. for Order Confirming Arb. Award at 5.) That information is extrinsic to the Agreement and the Court agrees it is bound by that determination.

5

requirement, *i.e.* no less than 80% of the first forecasted quarter. The arbitrator held that this provision was intended to set a baseline purchase amount below which any future negotiated minimum purchase amount could not go and also to serve as a fall-back in the event the parties could not agree on a new Quota. (App. at 37.)[6]

The construction of the Agreement, and the interpretation of its language, is pivotal in this case. The interpretation of this Agreement, as with any contract, is a question of law. *See D.E.W., Inc. v. Local 93, Laborers' Int'l Union of N. Am.,* 957 F.2d 196,199 (5th Cir. 1992). The determination of whether a contract is ambiguous is also a question of law. *See id.* "A contract is not ambiguous merely because the parties disagree upon the correct interpretation or upon whether it is reasonably open to just one interpretation." *Id.* The mere disagreement of the parties as to the meaning of a contract term will not transform an issue of law into an issue of fact. *See id.* If the written instrument is so worded as to be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and this Court will construe the contract as a matter of law. *See id.* Of course, if the contract is ambiguous, its interpretation becomes a question of fact and the Court must defer to the arbitrator's contractual interpretation. *See id.*

The rules regarding indefiniteness of material terms of a contract are based on the concept that a party cannot accept an offer to form a contract unless the terms of that contract are reasonably certain. *See Ski River Dev., Inc. v. McCalla*, 167 S.W.3d 121, 133 (Tex. App. - Waco 2005, pet. denied); Restatement (Second) of Contracts § 33(1) (1981). Thus, the actions of the parties may conclusively establish their intention to enter into a binding agreement even if some terms are left

---

[6] The Court disagrees with curasan's position that this analysis constituted a factual determination (*See* Reply to Motion for Confirmation of Arb. Award at 5.) The arbitrator made his determination based on the terms of the Agreement and the legal principles governing contract interpretation. Using those principles, the arbitrator concluded as a matter of law that the Agreement provided for a mandatory minimum purchase threshold for years 2005 through 2007.

for future agreement. *See McCalla*, 167 S.W.3d at 133; Restatement (Second) of Contracts § 33 cmt. a. To that end, Texas courts prefer to validate transactions rather than void them. *See McCalla*, 167 S.W.3d at 133. Yet a court may not create a contract where none exists and generally may not interpolate or eliminate material terms. *See id.* This conforms to the policy that parties, and not the courts, should make contracts. *See id.* Where the parties intended to make an agreement and there is a reasonably certain basis for granting a remedy, courts should find the contract terms definite enough to provide a remedy. *See* Tex. Bus. & Comm. Code Ann. § 2.204 (Vernon 1994); *see also* Restatement (Second) of Contracts § 33 cmt. b.

Reading the Agreement as a whole, the Court concludes that the Parties contemplated future negotiation and agreement on base/floor Quota amounts for 2005, 2006, and 2007. They also contemplated that Spinal Concepts would purchase at least 80% of its forecasted amount each quarter. The Agreement specifically provides a "base minimum" provision that utilizes an objective criterion for determining a minimum purchase amount - "no less than 80% of the first forecasted quarter." (Agreement § V.3.) The arbitrator interpreted the language "first forecasted quarter" to be the first forecasted quarter of 2003.[7]

The Court disagrees with the arbitrator's decision to fill the missing quarterly quota amount with an amount equal to 80% of the first forecasted quarter of 2003. (App. at 38.) Spinal Concepts correctly notes that the "first forecasted quarter" was not a static forecast. If the Parties intended the first forecasted quarter to mean a static forecast based on the first quarter of 2003, and that Spinal Concepts would purchase between 80% and 120% of that amount each quarter for the entire

---

[7] curasan argues, and the Court agrees, that it is bound by the arbitrator's factual determination that "[t]he projected sales of Cerasorb forecasted for the first quarter of the initial term were established at $189,000." (Reply at 5.) This determination was based on evidence extrinsic to the actual Agreement and therefore, the Court is bound by that factual determination.

7

life of the Agreement, there would have been no need for Spinal Concepts to provide a rolling four-quarter forecast every quarter. The Court believes the arbitrator erroneously extrapolated a fixed amount when the Parties intended a fluctuating amount based on market conditions.

The Agreement contemplates that a dynamic four-quarter forecast will be in effect at any given time. Section V.1.(i) specifies that Spinal Concepts, "at least 90 days prior to the beginning of each calendar quarter, shall deliver to curasan a sales forecast and estimated quantity of purchase of the Products for the next four (4) consecutive quarters." When reading Sections V.3 and V.1.(i) together combined with the intent of the Agreement as a whole, the Court reads the Agreement as requiring Spinal Concepts to purchase no less than 80% of the "first forecasted quarter" in effect at any given time.

curasan terminated the Agreement in January 2005 and consequently, Spinal Concepts did not deliver any quarterly forecasts for any of the quarters in years 2005-2007.[8] Without any quarterly forecasts, there is no way to calculate with any certainty "80% of the first forecasted quarter." Certainly, there could have been considerable fluctuation in the quarterly forecasts over the years. There is simply no way the Court or the arbitrator can determine this future amount with any reasonable certainty. While there is no doubt the Parties intended to form a contract, the Parties left open to negotiation and determination an essential quantity term, without which the Parties could not perform the contract. Without that term, and without any forecast to use for calculating that term with reasonable certainty, the Court cannot enforce the contract as to those years. Therefore, the Court hereby concludes that the terms of the Agreement are definite and enforceable

---

[8] There was some discussion at the August 9, 2006 hearing regarding the forecasts. Counsel for Spinal Concepts pronounced that, as required by the Agreement, Spinal Concepts issued several forecasts to curasan covering all of 2003 and 2004, and that its final forecast was for the amount of zero. By contrast, counsel for curasan maintained that curasan received only one forecast from Spinal Concepts - for the first quarter of 2003 - which was the forecast used by the arbitrator in his analysis.

as to the years 2003 and 2004, and the Agreement is unenforceable for the years 2005-2007.

## II.     DAMAGES CALCULATION.

Spinal Concepts argues that curasan is not entitled to recover lost profits because (1) the Agreement provides that termination and modification are the exclusive remedies allowed under the Agreement; and (2) the Agreement expressly disclaims all liability for lost profits.

First, Spinal Concepts argues that damages are barred as a matter of law by the terms of the Parties' Agreement, which states that "[i]n case the Distributor fails to achieve minimum Quotas for the first two-year period of this Agreement, Supplier may terminate or modify the terms of Distributor's exclusive distribution rights." (Agreement § IX.1.) Spinal Concepts contends that this provision must be interpreted as providing that curasan's exclusive remedy for Spinal Concepts' failure to meet its 2004 Quota is termination or modification of Spinal Concepts' exclusive distribution rights.[9]

The plain language of the Agreement provides under the heading entitled "TERMINATION," two circumstances in which curasan *may* terminate the Agreement: (1) in the case of material default of Spinal Concepts, where the default is not cured within ninety days from the date of written notice and (2) if Spinal Concepts fails to achieve its minimum Quotas for 2003 or 2004. Nowhere in this provision does the Agreement indicate that the Parties intended the option to terminate or modify to be the exclusive remedy in this type of circumstance. Furthermore, the UCC provides for a presumption that a remedy in a sale of goods contract is optional unless the remedy is expressly agreed to be exclusive. *See* Tex. Bus. & Comm. Code Ann. § 2.719(a)(2)

---

[9] curasan argues that the arbitrator's determination that the Agreement did not contain an exclusive remedy provision is a factual determination by which the Court is bound. The Court disagrees. The arbitrator made his determination based on the terms of the Agreement and the legal principles governing contract interpretation. Using those principles, the arbitrator concluded as a matter of law that the Agreement did not limit curasan's remedies for breach to termination or modification of Spinal Concepts' exclusive rights.

(Vernon 1994). There is nothing in the Agreement or in Spinal Concepts' argument to indicate that the Parties agreed or clearly expressed that this remedy would be the exclusive remedy. In fact, the use of the word "may" reflects the Parties' intent to make the remedy optional. That, combined with the presumption of § 2.719, establishes as a matter of law that the termination or modification remedy of Section IX.1 is optional rather than exclusive.

Because the Agreement does not contain an exclusive-remedy provision, the Court must determine whether curasan is entitled to recover its lost profits under Section IV.3. Section IV.3 states in relevant part that "in no event shall either party hereto be liable to the other party . . . for costs of procurement of substitute goods, lost profits *or any other special, consequential, incidental, or indirect damages*." (*See* Agreement § IV.3) Spinal Concepts proposes that this provision prohibits curasan from recovering "lost profits" in any sense of the word.

In his ruling, the arbitrator noted that the term "lost profits" appears in a listing of prohibited categories of damages that is then followed by the phrase "any other special, consequential, incidental, or, indirect damages." (Agreement § IV.3.) curasan argues, and the arbitrator agreed, that this limitation of liability provision prohibits recovery of lost profits only when those lost profits are a type of consequential, indirect, or incidental damages, not when they are a measure of a seller's direct damages for breach of contract. Both noted that a distinction exists between lost profits as a measure of a seller's direct damages for breach of contract and lost profits that are incidental to the breach. The arbitrator held that the Agreement only prohibits recovery of the latter.

On its face, the limitation of liability provision unambiguously prohibits recovery of any special, consequential, incidental, or indirect damages, including procurement of substitute goods or lost profits. In other words, it states that to the extent that lost profits are considered direct damages and not special, consequential, incidental, or indirect damages, they are excepted from this

provision. To interpret the Agreement otherwise would defy logic. Both Parties entered into this Agreement with the intention of making a profit - it is unreasonable to believe they would agree to forego lost profits directly arising from the other party's breach of the Agreement, as Spinal Concepts suggests.

As one Texas court explained, "[c]onsequential damages have been defined as those damages 'which do not arise within the scope of the immediate buyer-seller transaction, but rather stem from losses incurred by the non-breaching party in its dealings, often with third parties which were an approximate result of the breach." *Tennessee Gas Pipeline v. Lenape Res. Corp.*, 870 S.W.2d 286 (Tex. App. - San Antonio 1993), *rev'd on other grounds,* 925 S.W.2d 565 (Tex. 1996). As in *Lenape*, the profit curasan would have made from the Agreement is the money it would have received had Spinal Concepts purchased the Quota amount it was required to purchase for 2004. curasan is not seeking to recover profits from any third-party transaction that is consequential to the Agreement. Rather, it is seeking the damages that arise directly from the contract. Those damages are not consequential and thus, they are recoverable.

Thus, the Court finds as a matter of law that the Agreement is definite enough to enforce against Spinal Concepts for the year 2004 and that curasan may recover its lost profits for that year. Adjusting for curasan's 87% profit margin, curasan is entitled to $396,204 for breach of the agreement for 2004 (87% of $455,200). However, the terms of the Agreement are not definite enough to be enforceable as to the years 2005-2007. Therefore, the Court hereby VACATES the arbitration Award IN PART and AFFIRMS the arbitration Award IN PART.

It is SO ORDERED, this 7th day of September 2006.

_____
JORGE A. SOLIS
UNITED STATES DISTRICT JUDGE